UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| RENE R. SALLINGER, | |
| Plaintiff, | CASE NO. C08-5631FDB-KLS |
| v. | REPORT AND RECOMMENDATION |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | Noted for December 18, 2009 |
| Defendant. | |

Plaintiff, Rene R. Sallinger, has brought this matter for judicial review of the denial of his application for supplemental security income ("SSI") benefits. This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976). After reviewing the parties' briefs and the remaining record, the undersigned submits the following Report and Recommendation for the Court's review.

## FACTUAL AND PROCEDURAL HISTORY

Plaintiff currently is 39 years old.[1] Tr. 43. He has a tenth grade education and past work experience as a mixer, tool and equipment rental clerk and auto wrecking mechanic. Tr. 29, 89, 94, 129.

---

[1] Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

REPORT AND RECOMMENDATION
Page - 1

On December 10, 2003, plaintiff filed an application for SSI benefits, alleging disability as of June 1, 1996, due to psychosis, schizophrenia, suicidal tendencies, and back problems. Tr. 26, 81-85, 88, 97. His application was denied initially and on reconsideration. Tr. 26, 43-44, 69, 74. A hearing was held before an administrative law judge ("ALJ") on September 27, 2006, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. Tr. 350-407.

On January 22, 2007, the ALJ issued a decision, determining plaintiff to be disabled considering his substance use disorder, finding specifically in relevant part:

(1) at step one of the sequential disability evaluation process,[2] plaintiff had not engaged in substantial gainful activity since the date he filed his application;

(2) at step two, plaintiff had "severe" impairments consisting of schizophrenia, methamphetamine abuse and degenerative disc disease;

(3) at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings");

(4) after step three but before step four, based on all of plaintiff's impairments, plaintiff had the residual functional capacity to perform light exertional work, but could not sustain regular work while using drugs;

(5) at step four, plaintiff was unable to perform any of his past relevant work; and

(6) at step five, there were no jobs existing in significant numbers in the national economy that he could perform.

Tr. 26-30. The ALJ also determined, however, that if plaintiff stopped his substance use he would not be disabled, again specifically finding in relevant part:

(1) at step two of the sequential disability evaluation process, plaintiff's remaining limitations would cause more than a minimal impact on his ability to perform basic work activities, and thus he would continue to have a severe impairment or combination of severe impairments;

(2) at step three, none of plaintiff's impairments met or equaled the criteria of any of those contained in the Listings;

(3) after step three but before step four, plaintiff would have the residual functional capacity to perform essentially light work, with certain additional limitations;

(4) at step four, plaintiff would continue to be unable to perform his past relevant work; and

(5) at step five, there were a significant number of jobs existing in the national

---

[2] The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

| | economy plaintiff could perform, and thus his substance abuse disorder was a contributing factor material to the determination of disability. |
|---|---|

Tr. 30-40. Plaintiff's request for review was denied by the Appeals Council on August 22, 2008, making the ALJ's decision the Commissioner's final decision. Tr. 6; 20 C.F.R. § 416.1481.

On October 16, 2008, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1). The administrative record was filed with the Court on January 6, 2009. (Dkt. #10). Plaintiff argues the ALJ's decision should be reversed and remanded for an award of benefits or, in the alternative, for further administrative proceedings for the following reasons:

(a) the ALJ erred in not finding plaintiff's right knee and bipolar impairments to be severe;

(b) the ALJ erred in finding plaintiff's impairments did not meet or equal the criteria of Listings 1.04, 12.03 or 12.04;

(c) the ALJ erred in assessing plaintiff's residual functional capacity; and

(d) the ALJ erred in finding plaintiff's substance use disorder to be a contributing factor material to the determination of disability.

For the reasons set forth below, the undersigned does not agree that the ALJ erred in determining plaintiff to be not disabled, and therefore recommends that the ALJ's decision be affirmed.

## DISCUSSION

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I. The ALJ's Step Two Analysis

At step two of the sequential disability evaluation process, the ALJ must determine if an impairment is "severe." 20 C.F.R. § 416.920. An impairment is "not severe" if it does not "significantly

1  limit" a claimant's mental or physical abilities to do basic work activities. 20 C.F.R. § 416.920(a)(4)(iii),
2  (c); Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 *1. Basic work activities are those "abilities
3  and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b); SSR 85- 28, 1985 WL 56856 *3.

An impairment is not severe only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual[']s ability to work." See SSR 85-28, 1985 WL 56856 *3; Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988). Plaintiff has the burden of proving that his "impairments or their symptoms affect his ability to perform basic work activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998). The step two inquiry described above, however, is a *de minimis* screening device used to dispose of groundless claims. Smolen, 80 F.3d at 1290.

As noted above, the ALJ found plaintiff's schizophrenia, methamphetamine abuse and degenerative disc disease to be severe impairments. Tr. 28. Plaintiff argues the ALJ erred in not also finding his right knee impairment and bipolar disorder to be severe. The undersigned disagrees, as there is little evidence in the record to show either condition had more than a minimal effect on plaintiff's ability to perform basic work-related activities. With respect to the knee impairment, plaintiff points to an evaluation performed in early July 2000, by Frank D. Paudler, M.D., and Edward Hoffman, M.D. Tr. 211-18. Although "a slight limp in the right lower extremity" was noted, plaintiff was able to toe and heel walk, albeit with some self-reported tenderness. Tr. 214. In addition, while plaintiff tended "to lose his balance" when standing on his right leg, he could "do a full squat." Id.

Lumbar flexion caused "some medial right knee pain," but straight leg raising was "negative bilaterally," and motor testing in the lower extremities was intact, as was sensation for the most part. Tr. 214-15. Full strength was demonstrated in the lower extremities as well. Tr. 214. More specifically in regard to plaintiff's knees, neither showed any effusion and both had intact ligaments, although the right thigh did show "significant . . . atrophy" and there was "some crepitation noted about the right knee." Tr. 215-16. Drs. Paudler and Hoffman diagnosed plaintiff with: (1) right thigh hematoma/abscess; (2) status post drainage of a right thigh hematoma; (3) right thigh residual loss of motion atrophy and related residual aching pain in the right knee and thigh; and (4) rule out right knee medial and/or lateral meniscus tear. Tr. 216. Plaintiff's condition was "not deemed to be fixed and stable," and an MRI of the right knee and thigh

REPORT AND RECOMMENDATION
Page - 4

1 was recommended. Tr. 216-17.

2 While certainly some pain, atrophy and balance issues were noted with respect to plaintiff's right lower extremity, not all of those symptoms were specific to his knee. No actual work-related limitations, furthermore, were found by Dr. Paudler and Dr. Hoffman. That is, they did not opine that plaintiff should be restricted from performing basic work activities in any way. As such, their evaluation report does not support a finding of severity at step two. It is true that an MRI performed in early August 2000, showed a "[s]mall complex tear" in the medial meniscus (Tr. 219), but the existence of an impairment or medical condition alone is not sufficient to demonstrate severity. See Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993) (mere existence of impairment is insufficient proof of disability). The same is true regarding the surgical procedure performed by Alan Thomas, M.D., in late August 2001, as no work-related restrictions lasting longer than a couple of weeks were imposed as a result thereof. See Tr. 227-28; see also Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (claimant must suffer from medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for continuous period of not less than twelve months).

Plaintiff next points to Dr. Thomas's mid-October 2001 opinion that he had "a total of twenty-four (24) percent [permanent partial] impairment of his right lower extremity." Tr. 223. Plaintiff, though, takes this opinion out of context. First, it was provided for worker's compensation purposes, and thus does not necessarily translate into a Social Security disability benefits determination. Second, in the same report in which Dr. Thomas provided that opinion, he also found plaintiff's right knee to be stable, normal flexion and good flexion strength in that knee, and only slight loss of strength and sensation compared to the other knee. Id. Dr. Thomas also noted at the time that while he had "reached maximal medical treatment" at the 24 percent permanent partial impairment level, plaintiff still reported improvement and "doing better" than before his knee surgery. Id.

Accordingly, there is no indication as to what Dr. Thomas meant in regard to specific work-related limitations, if any, resulting from such an impairment rating. Indeed, plaintiff told Dr. Thomas that he had "been back at work for the last few weeks and" had "been tolerating his job well." Id. Prior progress notes, furthermore, also strongly indicate Dr. Thomas believed plaintiff was not significantly limited in terms of his ability to work. For example, in late August 2001, just after surgery was performed, Dr.

Thomas stated he expected plaintiff "to be able to return to work full duty without restrictions" after "about two weeks." Tr. 228. On September 6, 2001, Dr. Thomas informed plaintiff that there was "nothing mechanically wrong inside his knee at this time," that he needed "to move forward," and that while it was not "unreasonable for him to be off work for several more days," he should "return to work on [September 9] without restrictions." Tr. 224.

Lastly, plaintiff points to a March 11, 2005 progress noted from James A. Wilson, M.D., in which he noted "[c]ontinued RLE [right lower extremity] pain," followed by a statement that plaintiff could "lift 20 [pounds] occ[asionally], walk 10 min[ute]s, stand 20 min[ute]s, [and] sit 1 h[ou]r," but could not climb ladders, crawl or kneel. Tr. 332. There is no indication, however, that Dr. Wilson attributed either the pain or the limitations he found to problems with plaintiff's right knee. Thus, for example, in the section of the medical history portion of the treatment form Dr. Wilson completed, only the boxes for back, foot and leg pain were checked. Id. On the second page of that form, furthermore, although Dr. Wilson did indicate he planned to write a note "for general work restrictions," he did not explain what those restrictions would be, and, in any event, found plaintiff to be "fit to find work." Tr. 331.

Accordingly, the undersigned finds the ALJ properly did not determine plaintiff to have a severe right knee impairment. In addition, to the extent the medical evidence in the record does indicate work-related restrictions stemming from right lower extremity pain, those restrictions are taken into account by the ALJ's determination that plaintiff's degenerative disc disease was severe. As for plaintiff's allegation that he had a severe bipolar disorder, there are few references to such a disorder in the objective medical evidence in the record. In late December 2003, he was diagnosed only with schizophrenia and "[i]mproved psychosis." Tr. 249. In late January 2004, plaintiff was given diagnoses of psychosis and a rule out bipolar disorder, but no actual finding of that disorder was made. Tr. 272. In late February 2004, schizophrenia was diagnosed, but even then plaintiff was noted to be "[d]oing better." Tr. 247.

Based on a psychiatric evaluation he performed in early March 2004, Harold C. Thurman, M.D., diagnosed plaintiff with methamphetamine dependence in apparent remission, methamphetamine-induced psychosis and rule out ongoing methamphetamine use. Tr. 285. While Dr. Thurman felt plaintiff's history did "not seem to be consistent with a true schizophrenic or schizoaffective disorder," he also did not make any findings with respect to a bipolar disorder. Id. In a state agency residual mental functional capacity

assessment form completed by Anita Peterson, Ph.D., in late March 2004, and then affirmed by Thomas Clifford, Ph.D., in late June 2004, plaintiff was diagnosed with methamphetamine dependence, rule out relapse, and methamphetamine-induced psychosis. Tr. 194, 200.

In late August 2006, and again in early September 2006, Dr. Wilson diagnosed plaintiff with both methamphetamine addiction and a bipolar disorder, but he did not opine as to any work-related limitations stemming therefrom. Tr. 318-19. Accordingly, here too plaintiff has failed to establish the existence of a severe impairment consisting of that disorder. In regard to the late January 2004 psychosis and rule out bipolar disorder diagnoses, plaintiff notes that at the same time he was assessed with a global assessment of functioning ("GAF") score of 40-45 (Tr. 272), which "indicates '[s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning,' such as an inability to keep a job." Pisciotta v. Astrue, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007) (quoting Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) ("DSM-IV-TR") at 34). But as the bipolar disorder diagnosis was merely a "rule out" diagnosis, no definitive limitations can be attributed to it.

Plaintiff also notes his own self-reports that he heard voices, had difficulty sleeping, and did not feel safe in small areas or at night as evidence he suffered from a bipolar disorder. But there is nothing in the record to suggest that such symptoms are more likely due to a bipolar disorder than others plaintiff has been diagnosed with, such as schizophrenia or methamphetamine-induced psychosis. In any event, at step two of the disability evaluation process, only objective medical evidence is considered.[3] In addition, the ALJ found plaintiff to be not fully credible regarding his alleged symptoms and limitations – a finding not challenged by plaintiff – and, thus, to the extent the ALJ was required to consider his self-reports, he did not err in declining to adopt them. The undersigned, therefore, also finds no error on the part of the ALJ in

---

[3] Although the ALJ must take into account a claimant's pain and other symptoms (see 20 C.F.R. § 404.1529), the severity determination is made solely on the basis of the objective medical evidence in the record:

> A determination that an impairment(s) is not severe requires a careful evaluation of the medical findings which describe the impairment(s) and an informed judgment about its (their) limiting effects on the individual's physical and mental ability(ies) to perform basic work activities; thus, an assessment of function is inherent in the medical evaluation process itself. <u>At the second step of sequential evaluation, then, medical evidence alone is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities.</u> If this assessment shows the individual to have the physical and mental ability(ies) necessary to perform such activities, no evaluation of past work (or of age, education, work experience) is needed. Rather, it is reasonable to conclude, based on the minimal impact of the impairment(s), that the individual is capable of engaging in SGA.

SSR 85-28, 1985 WL 56856 *4 (emphasis added).
REPORT AND RECOMMENDATION
Page - 7

failing to find plaintiff's alleged bipolar disorder to be severe.

II.     The ALJ's Step Three Findings

At step three of the sequential disability evaluation process, the ALJ must evaluate the claimant's impairments to see if they meet or equal any of the impairments listed in 20 C.F. R. Part 404, Subpart P, Appendix 1 (the "Listings"). 20 C.F.R. § 416.920(d); Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999). If any of the claimant's impairments meet or equal a listed impairment, he or she is deemed disabled. Id. The burden of proof is on the claimant to establish he or she meets or equals any of the impairments in the Listings. Tacket, 180 F.3d at 1098. However, "[a] generalized assertion of functional problems is not enough to establish disability at step three." Id. at 1100 (citing 20 C.F.R. § 404.1526).

A mental or physical impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508, § 416.908. It must be established by medical evidence "consisting of signs, symptoms, and laboratory findings." Id.; see also SSR 96-8p, 1996 WL 374184 *2 (determination that is conducted at step three must be made on basis of medical factors alone). An impairment meets a listed impairment "only when it manifests the specific findings described in the set of medical criteria for that listed impairment." SSR 83-19, 1983 WL 31248 *2.

An impairment, or combination of impairments, equals a listed impairment "only if the medical findings (defined as a set of symptoms, signs, and laboratory findings) are at least equivalent in severity to the set of medical findings for the listed impairment." Id.; see also Sullivan v. Zebley, 493 U.S. 521, 531 (1990) ("For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.") (emphasis in original). However, "symptoms alone" will not justify a finding of equivalence. Id. The ALJ also "is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence." Burch v. Barnhart, 400 F.3d 676 (9th Cir. 2005).

The ALJ need not "state why a claimant failed to satisfy every different section of the listing of impairments." Gonzalez v. Sullivan, 914 F.2d 1197, 1201 (9th Cir. 1990) (finding ALJ did not err in

failing to state what evidence supported conclusion that, or discuss why, claimant's impairments did not meet or exceed Listings). This is particularly true where, as noted above, the claimant has failed to set forth any reasons as to why the Listing criteria have been met or equaled. Lewis v. Apfel, 236 F.3d 503, 514 (9th Cir. 2001) (finding ALJ's failure to discuss combined effect of claimant's impairments was not error, noting claimant offered no theory as to how, or point to any evidence to show, his impairments combined to equal a listed impairment).

As noted above, the ALJ determined that none of plaintiff's impairments, including his substance use disorder met or equaled the criteria of any impairment contained in the Listings. Specifically, the ALJ found in relevant part in regard to his physical impairments as follows:

> Claimant's disc disease has not shown evidence of nerve root compression. He had some claimed sensory and motor loss, but the bulk of the record shows that these are minor. Straight leg raise tests were normally negative. Claimant does not have spinal arachnoiditis confirmed by operative note or pathology report, and does not have lumbar spinal stenosis resulting in claudication.

Tr. 29; see also Tr. 31. Plaintiff argues the ALJ erred in not finding any of his physical impairments met or equaled the criteria of Listing 1.04A (disorders of the spine). The requirements for meeting Listing 1.04A are:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App. 1, §1.04.

Plaintiff argues that, contrary to the ALJ's findings, the record shows his physical impairments did meet, or at least medically equal, the above Listing criteria. For example, plaintiff notes he was diagnosed with degenerative disc disease, was found to have positive straight leg raising, radiculopathy and decreased sensation in his lower right extremity, demonstrated reduced back range of motion, and showed diminished right lower extremity strength as compared to the left. See Tr. 230, 235, 247, 277-78. But the undersigned finds the ALJ's description of the objective medical evidence in the record to be more accurate. Range of motion in his back, for example, was largely intact, lower extremity strength was for

the most part full and there was little to no sensation or motor loss overall. See Tr. 214-16, 223, 230-31, 235, 237, 240, 247, 251, 258, 262, 267, 274-75, 278, 329, 323, 331, 335.

While, as noted above, the record contains some evidence of radiculopathy on occasion, no specific nerve root impingement was shown on any of the electrodiagnostic studies taken of plaintiff's back or right lower extremity. See 219-20, 229-30, 243. As such, the ALJ properly found that the criteria of Listing 1.04 had not been met. Nor does the objective medical evidence in the record establish the presence of medical findings equal in severity to all of the criteria for that Listing. The ALJ, accordingly, did not err in this part of his step three analysis. The undersigned further finds the ALJ did not commit any error in finding none of plaintiff's mental impairments met or equaled the Listings. Specifically, the ALJ found in relevant part:

> . . . When he is sober from drugs, his schizophrenia is only marginally severe and means that he can still perform simple, repetitive tasks with limited contact with the general public and coworkers. When he does use drugs, his schizophrenia is more severe yet does not meet any listings. He had an episode of decompensation related to methamphetamine use and schizophrenia but did not have marked limits in function according to the record after December 2003, his application date. . . .
>
> When he uses drugs, he has moderate limits on activities of daily living, moderate limits on social function, moderate limits on concentration, persistence, and pace, and has had one episode of decompensation. There is not [sic] evidence of the "C" [Listings] criteria.
>
> . . .
>
> . . . When sober, his schizophrenia gives him mild limits on activities of daily living, moderate limits in social function, mild limits with concentration, persistence, and pace, and no episodes of decompensation. There is not [sic] evidence of the "C" [Listings] criteria.

Tr. 29, 31.

Plaintiff disagrees with the ALJ's findings, arguing his schizophrenia and psychosis meet or equal the criteria contained in Listing 12.03C, which reads:

> 12.03 Schizophrenic, Paranoid and Other Psychotic Disorders: Characterized by the onset of psychotic features with deterioration from a previous level of functioning.
>
> . . .
>
> C. Medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or

REPORT AND RECOMMENDATION
Page - 10

> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.F. Pt. 404, Subpt. P, App. 1, § 12.03. Specifically, plaintiff asserts he has had both schizophrenia and psychosis for over two years' duration, which has affected his work and resulted in repeated episodes of decompensation.[4] Even if the three things plaintiff alleges here are true, they are not sufficient to meet or medically equal any of the above specific Listing 12.03C criteria. That is, plaintiff has not shown, nor does the medical evidence in the record establish, that even a minimal increase in his mental demands or change in the environment would cause him to decompensate, or that for any length of time he had been unable to function outside a highly supportive living arrangement. In addition, at most there is evidence of only one or two episodes of decompensation in the record. See Tr. 202. Again, the medical evidence in the record, for the same reasons, does not come close to establishing equivalence.

III.     The ALJ's Assessment of Plaintiff's Residual Functional Capacity

If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2. A claimant's residual functional capacity ("RFC") assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. Id. It thus is what the claimant "can still do despite his or her limitations." Id.

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. Id. However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." Id. Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id. In assessing a claimant's RFC, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other

---

[4] Plaintiff also asserts his mental impairments meet or equal the criteria of Listing 12.04 (affective disorders), but has presented no argument or pointed to any objective medical evidence in the record to establish that this is so. The undersigned thus finds this assertion to be without merit. The undersigned, furthermore, finds nothing in the record to demonstrate that those criteria have been met or shown to be medically equivalent in this case. See 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.04.

REPORT AND RECOMMENDATION
Page - 11

evidence." Id. at *7.

Here, the ALJ found plaintiff would have the following residual functional capacity if he stopped his substance use:

> If the claimant stopped the substance use, the claimant would have the residual functional capacity to occasionally lift and carry 20 pounds, frequently lift and carry ten pounds, stand and/or walk for four to five hours in an eight hour day for no more than an hour at a time, and do unlimited pushing and pulling. He cannot do repetitive bending. He can do simple, repetitive tasks with limited contact with the general public and coworkers.

Tr. 31. Plaintiff asserts the evidence in the record shows he only has the exertional tolerance for less than light work, due in part to not being able to stand for more than two hours in an eight-hour workday or to perform any work that exists in the national economy. Plaintiff further asserts the ALJ failed to consider the impact of his permanent partial right lower extremity impairment, which he again asserts resulted in Dr. Wilson finding him limited to walking for 10 minutes, standing for 20 minutes, sitting for an hour, and no crawling, kneeling or climbing ladders.

As to plaintiff's first assertion, he points to no specific evidence in the record indicating he cannot stand for more than two hours in an eight-hour workday. It is true, as noted above, that Dr. Wilson opined as to a 20 minute standing limitation. However, he gave no indication as to whether this limitation was for a whole eight-hour workday or at a time. If the latter, than certainly the standing limitation that Dr. Wilson found could allow for greater than two hours of standing in one day. In any event, as discussed above, the weight of the objective medical evidence in the record fails to support – and, therefore, the ALJ did not err in declining to adopt (see Tr. 35) – any standing limitations from Dr. Wilson greater than those set forth by the ALJ in his RFC assessment. The same is true with respect to the other limitations Dr. Wilson noted in his early March 2005 progress note. See id.

Plaintiff also argues the ALJ failed to take into account certain other additional mental functional limitations. Specifically, he asserts that the general mild limitations in activities of daily living found by Drs. Clifford and Peterson based on their review of the record (see Tr. 202) is inconsistent with his own statements regarding his mental functioning, as well as those of his sister. As discussed above, though, plaintiff has not challenged the ALJ's discounting of his credibility, nor has he done so with respect the ALJ's treatment of the lay witness evidence in the record. As such, the ALJ was not required to adopt the statements provided by plaintiff and his sister.

As further evidence of the ALJ's improper residual functional capacity assessment, plaintiff points as well to the findings of Dr. Clifford and Dr. Peterson that he was moderately limited: in his ability to understand and remember detailed instructions; in four functional areas of sustained concentration and persistence; in two such areas of social interaction; and in his ability to respond appropriately to changes in the work setting. See Tr. 206-07. Plaintiff also notes the statement by Drs. Clifford and Peterson that he would have "difficulty with changes." Tr. 208. The ALJ's determination that plaintiff was restricted to simple, repetitive tasks and to limited contact with both co-workers and the public, however, clearly takes into account the moderate limitations regarding understanding and remembering detailed instructions and the two areas of social functioning, both of which concern co-workers and the public.

The ALJ also properly did not adopt the moderate limitations found by Drs. Clifford and Peterson with respect to concentration, persistence and changes in the work setting. The ALJ did find plaintiff had moderate limitations in regard to concentration, persistence or pace, but only when he was using drugs. Tr. 29, 31. Indeed, the only diagnoses Dr. Clifford and Dr. Peterson gave plaintiff – and on which they based the mental functional limitations they assessed him with – were methamphetamine-induced psychosis and a history of methamphetamine dependence, along with an additional diagnosis of "[rule-out] relapse." Tr. 194, 200. Clearly, then, they felt the limitations on concentration, persistence or pace and changes in the work setting, were the result of drugs, not a free-standing psychological condition.

As pointed out by plaintiff and noted above, Drs. Clifford and Peterson found him to be only mildly restricted in his activities of daily living, even with the methamphetamine-based diagnoses they gave him. Tr. 202. Still, the ALJ gave plaintiff the benefit of the doubt by finding him to be moderately limited in that area of functioning when using drugs. Tr. 29. The findings of Dr. Clifford and Dr. Peterson, however, fail to provide any evidence of more than mild limitations in this area absent the influence of drugs. In addition, again as discussed above, the ALJ was not required to adopt the mental functional symptoms plaintiff and his sister reported he had, and which plaintiff argues is indicative of greater restriction in his ability to perform such activities.

Plaintiff next argues Dr. Thurmon's conclusions support a finding that he would have difficulty performing work activities on a consistent basis, that he would be unable to complete a normal workday or workweek and that he would not be able to deal with stress. The undersigned disagrees. As noted above,

Dr. Thurman gave plaintiff the following diagnoses: methamphetamine dependence in apparent remission, methamphetamine-induced psychosis, and rule out ongoing methamphetamine use. Tr. 285. Dr. Thurman noted that plaintiff had been diagnosed with a "substance-induced psychotic disorder with delusions and hallucinations" in mid-June 1996, and only began hearing voices again "3-4 months ago." Tr. 281-82. In addition, plaintiff "did not unequivocally indicate he was necessarily always hearing voices," nor did he "appear to be attending to any internal stimuli during the entirety of" the interview. Tr. 282, 284. In terms of prognosis and ability to function, Dr. Thurman opined in relevant part as follows:

> . . . It is my clinical suspicion that this gentleman may have had a relapse in his methamphetamine dependence. It is quite unusual to have a relapse in the voices after such a long period of abstinence. His history does not seem to be consistent with a true schizophrenic or schizoaffective disorder. His history is very notable for long-term substance abuse issues. His problem is treatable. With abstinence from any substances and regular medication use, he should recover.
>
> . . . Based on the evidence today, he is capable of managing his own funds . . .
>
> He has the ability to perform simple and repetitive tasks . . .
>
> I believe he may have difficulty performing work activities on a consistent basis secondary to the fact [that] he is somewhat sedated by his current medications.
>
> Again, I believe there is a significant possibility he has relapsed into his methamphetamine issue. I believe he will need to be abstinent from any illicit substances.
>
> I doubt if he could complete a normal workday or workweek without interruption from his psychiatric condition/possible relapsed substance use issue.
>
> I believe he would have difficulty dealing with the stress usually encountered in competitive work.

Tr. 285-86.

With respect to Dr. Thurman's opinion, the ALJ found in relevant part:

> Claimant saw Harold Thurman, M.D., for a consultative exam on March 8, 2004. Dr. Thurman reviewed records that showed claimant had drug-induced psychosis in 1996. . . . Dr. Thurman believed claimant had relapsed on drugs and that therefore claimant could not complete a normal workday or workweek. He did not assess claimant with any mental issues not related with methamphetamine abuse (18F). This is largely consistent with the record and is given great weight. However, the record does not provide much support for the fact that claimant was unduly sedated by his medications. In fact, claimant's quick ability to perform tasks in the mini mental status exam belies that he was sedated by his medications.

Tr. 36-37. The undersigned finds the ALJ's findings here to be proper. First, the record does show that the diagnoses Dr. Thurman gave plaintiff were all related to his drug use. Thus, while Dr. Thurman did

find limitations in regard to completing a normal workday or workweek and dealing with stress, they were the result of such use. The ALJ, accordingly, did not err in excluding those limitations from his assessment of plaintiff's RFC. In addition, although Dr. Thurman opined that plaintiff <u>may</u> have difficulties performing at a consistent pace due to some sedation from his medication, the ALJ noted that the record, including Dr. Thurman's own mental status examination, failed to adequately support such a limitation.

Plaintiff also relies on two different GAF scores with which he was assessed, one by Penny Leah Tanner, Ph.D., and the other by Dr. Thurman. Dr. Thurman assessed plaintiff with a GAF score of 52, which indicates moderate symptoms or moderate difficulty in social, occupational or school functioning. Tr. 285; <u>see</u> <u>Tagger v. Astrue</u>, 536 F.Supp.2d 1170, 1173 n.6 (C.D.Cal. 2008). But, as discussed above, this score, and the more specific mental functional limitations Dr. Thurman also found, were based on substance-induced diagnoses. As such, the ALJ did not err in declining to adopt those limitations, and the GAF score in general, in assessing plaintiff's residual functional capacity <u>without</u> the effects of drug use. Dr. Tanner also assessed plaintiff with a GAF score of 40-45, based on diagnoses consisting of psychosis, not otherwise specified, and rule out bipolar disorder. Tr. 272.

In regard to Dr. Tanner's report, the ALJ found in relevant part:

> In January 2004, he saw Penny Tanner, Ph.D., ARNP, for an initial mental assessment. He was on Risperdal and Zantac. He had difficulty with sleep and felt that someone wanted to hurt him. He had periods when he felt fine. He had increased anxiety in bursts. He tried to read or occupy his mind to screen out bursts. . . . He heard whispers (15F.3).
>
> Ms. Tanner put claimant on Risperdal and Depakote, and later in January claimant reported that he felt better. He did not feel safe in small areas or at night and still had thoughts and heard voices. He was more social and less depressed. He understood that his auditory hallucinations and paranoid delusions were not real. . . . In February 2004, claimant told a nurse at Dr. Wilson's office that he was doing well on his medications and no longer heard voices (12F.4). I note that the record does not support that [sic] claimant had any psychosis without drug use. His reports of hearing voices were somewhat vague and inconsistent, which damages their credibility.

Tr. 36. As with Dr. Thurman's opinion, these are valid reasons for declining to adopt the GAF scores with which Dr. Tanner assessed plaintiff as well.

In addition, while a GAF score is "relevant evidence" of a claimant's ability to function mentally, and may be "of considerable help" to the ALJ in assessing it, "it is not essential" to the accuracy thereof. <u>England v. Astrue</u>, 490 F.3d 1017, 1023, n.8 (8th Cir. 2007); <u>Howard v. Commissioner of Social Security</u>,

276 F.3d 235, 241 (6th Cir. 2002). As such, an ALJ's "failure to reference the GAF score" in assessing a claimant's residual functional capacity "standing alone" does not make the residual functional capacity assessment inaccurate. Id. In other words, the mere fact that a low GAF score may have been assessed by a medical source, as in this case, is not in itself sufficient to establish disability. Finally, plaintiff requests that the Court consider his limited education in determining the propriety of the ALJ's residual functional capacity assessment. This factor, however, is properly considered not here, but rather at step five of the sequential disability evaluation process, which the ALJ did. See Tr. 39-40, 400.

IV. Plaintiff's Substance Use Disorder as a Material Factor

A claimant is not disabled if alcoholism or drug addiction would be "a contributing factor material" to the Commissioner's disability determination. Bustamante v. Massanari, 262 F.3d 949, 954 (9th Cir. 2001) (citing 42 U.S.C. § 423(d)(2)(C), 42 U.S.C. § 1382c(a)(3)(J), 20 C.F.R. § 416.935(a)). To determine whether alcoholism or drug addiction is a materially contributing factor, the ALJ first must conduct the five-step sequential disability evaluation process "without separating out the impact of alcoholism or drug addiction." Id. at 955. If the ALJ determines that the claimant is not disabled, "then the claimant is not entitled to benefits." Id.

If the claimant is found to be disabled, however, "and there is 'medical evidence of [his or her] drug addiction or alcoholism,'" the ALJ proceeds "to determine if the claimant 'would still [be found] disabled if [he or she] stopped using alcohol or drugs.'" Id. (citing 20 C.F.R. § 416.935). Thus, if a claimant's current limitations "would remain once he [or she] stopped using drugs and alcohol," and those limitations are disabling, "then drug addiction or alcoholism is not material to the disability, and the claimant will be deemed disabled." Ball v. Massanari, 254 F.3d 817, 821 (9th Cir. 2001).

As noted above, the ALJ found that because plaintiff would not be disabled if he stopping his substance use, his substance use disorder was a contributing factor material to the disability determination. Tr. 40. Plaintiff argues the ALJ erred in so finding, asserting his substance use disorder could not be material, since his non-drug related conditions met or equaled the Listing. As explained above, though, the ALJ did not err in finding otherwise at step three. Next, plaintiff argues the combination of his low back and right knee impairments restricts him to performing sedentary work, which – along with his mental health impairments and limited education – "likely" so narrows "his potential job base that a

finding of not disabled is merited." (Dkt. #12, p. 16).

Whether a combination "likely" narrows the occupational base does not at all establish that it is in fact so narrowed. In any event, plaintiff's argument does not hold up, again given that the ALJ properly did not find any severe right knee impairment, that the medical evidence in the record supports the ALJ's assessment of plaintiff's physical residual functional capacity (at a level above sedentary), and that the ALJ did not err in finding any disabling effects of plaintiff's mental impairments were the result of or induced by his use of drugs. Plaintiff asserts it is doubtful his "mild use of drugs has exacerbated his long standing mental health condition to the extent indicated by the" ALJ. (Id.). But the record does not bear this out, as the majority of medical opinion source evidence in the record – including the findings from Dr. Thurman, who provided the most comprehensive mental health evaluation – reveal that drugs indeed are a substantial factor affecting plaintiff's psychological condition.

That plaintiff previously was found disabled due to a mental health condition, furthermore, does not mean, as the record shows, that he is disabled because of such a condition absent his substance use disorder during the time period relevant to this case. Similarly, while a return to work in an effort to better himself certainly is admirable, and although that return may have caused him to experience stress and an increase or worsening in his symptoms, again the record does not support a finding that plaintiff is unable to do any work absent the substance use. In addition, even if it is true that an increase or worsening in his symptoms caused him to use drugs to self medicate, once more the record fails to support plaintiff's assertion that his mental health symptoms were independent of his drug use. The use of drugs to self-medicate also is strong evidence that plaintiff's substance use disorder was a material factor, as properly found by the ALJ, to the determination of his disability.

## CONCLUSION

Based on the foregoing discussion, the Court should find the ALJ properly concluded plaintiff was not disabled, and should affirm the ALJ's decision.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985). Accommodating the time limit

1 imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **December 18,**
2 **2009**, as noted in the caption.
3       DATED this 23rd day of November, 2009.

                                           Karen L. Strombom
                                           United States Magistrate Judge